IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-13

No. 178A20

Filed 12 March 2021

IN THE MATTER OF:  Z.J.W.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from order entered on 23 September 2019 by Judge Elizabeth Freshwater-Smith in District Court, Nash County.  Heard in the Supreme Court on 17 February 2021.

*Jayne B. Norwood for petitioner-appellee Nash County Department of Social Services.*

*Poyner Spruill LLP, by Caroline P. Mackie, for appellee Guardian ad Litem.*

*Garron T. Michael for respondent-appellant father.*

ERVIN, Justice.

Respondent-father Scott A. appeals from a trial court order terminating his parental rights in his minor child Z.J.W.[1]  After careful consideration of respondent-father's challenges to the trial court's termination order in light of the record and the applicable law, we reverse the trial court's order, in part; vacate the trial court's order, in part; and remand this case to the District Court, Nash County, for further proceedings not inconsistent with this opinion.

---

[1] Z.J.W. will be referred to throughout the remainder of this opinion as "Jill," which is a pseudonym used for ease of reading and to protect the identity of the juvenile.

¶ 2        Jill was born in August 2008 to respondent-father and the mother, Amy T.[2] The parents, who were never married and whose relationship was marred by incidents of domestic violence, also had a son,[3] who was born in October 2006. As a result of the level of conflict between the parents, the mother would routinely retreat to Nash County, where a number of the members of her family lived, during difficult times. Eventually, the mother left respondent-father and Steven in Buncombe County and moved to Nash County with Jill. Respondent-father had no further contact with Jill for many years after her departure for Nash County.

¶ 3        The mother married another man after relocating to Nash County. On 29 January 2015, allegations of neglect relating to Jill were made to the Nash County Department of Social Services. During the ensuing investigation, the mother's husband admitted that he had had sexual fantasies involving Jill. After DSS provided assistance to respondent-mother and her husband, the investigation into the neglect allegations relating to Jill was closed on 11 August 2015.

¶ 4        On 25 June 2017, the Nash County DSS received a child protective services report relating to an incident of domestic violence involving the mother and her husband. In the course of the resulting investigation, the mother reported that her

_____

[2] Although the trial court terminated the mother's parental rights in Jill in the order that is before us in this case, she did not seek appellate review of the trial court's decision and is not a party to the proceedings on appeal.

[3] The parents' son will be referred to throughout the remainder of this opinion as "Steven," which is a pseudonym used for ease of reading and to protect the juvenile's privacy.

husband had raped her earlier in the evening, that he had previously committed acts of sexual abuse against Jill, and that she had allowed the husband to continue to live in the family home with Jill despite her knowledge of his conduct. In addition, the husband admitted that he had sexually abused Jill on several occasions. As a result, the mother and the husband were arrested and charged with the commission of several criminal offenses while Jill was placed with her maternal aunt.

¶ 5        On 14 July 2017, a social worker employed by the Nash County DSS contacted respondent-father and informed him about Jill's situation. At that time, respondent-father stated that he could not remember the last time that he had seen Jill. Although he claimed that he had spoken with Jill over the phone since the last time that he had seen her, respondent-father could not provide the date upon which this conversation had occurred. Respondent-father did not, at any point during this conversation, question the social worker about Jill's well-being or where she was living. In spite of the fact that the social worker provided respondent-father with her own contact information, he did not make any further effort to communicate with the social worker.

¶ 6        In October 2017, the Buncombe County Department of Social Services filed a petition alleging that Steven was an abused, neglected, and dependent juvenile and obtained the entry of an order placing him in nonsecure custody. In its petition, the Buncombe County DSS alleged that it had received a child protective services report

on 9 December 2016 asserting that respondent-father had been involved in a physical altercation with his own mother in Steven's presence. On 29 March 2018, Judge Susan M. Dotson-Smith entered an order finding Steven to be a neglected and dependent juvenile. On 12 June 2018, Judge Ward D. Scott entered a dispositional order placing Steven in the custody of the Buncombe County DSS and ordering respondent-father to submit to random drug screens, obtain a psychosexual evaluation, and complete a parenting class.

¶ 7        On 10 January 2018, the Nash DSS filed a petition alleging that Jill was an abused and neglected juvenile. In its petition, the Nash County DSS alleged, among other things, that the husband had admitted to having sexually abused Jill and that the mother had, despite her knowledge of the husband's fantasies about having sexual contact with Jill, enabled the husband's abuse of Jill by burning Jill's diary, in which Jill described the mistreatment that she had experienced, and continuing to live with the husband despite her knowledge of his conduct.

¶ 8        After a hearing held on 7 June 2018, Judge Wayne S. Boyette entered an order on 27 July 2018 finding Jill to be an abused and neglected juvenile. In his order, Judge Boyette found that, while respondent-father did not have a relationship with Jill and had not seen her in over six years, he had expressed a desire to have custody of her. Judge Boyette placed Jill in the custody of the Nash County DSS, sanctioned a permanent plan of reunification with a concurrent plan of adoption, and prohibited

visitation between respondent-father and Jill "until [such visitation was] recommended by [Jill's] therapist." Finally, Judge Boyette ordered respondent-father "to work with [the Buncombe County DSS] and complete their court ordered recommendations and service plan." As of October 2018, Judge Dotson-Smith had determined that respondent-father had "completed all recommendations" imposed by the District Court and the Buncombe County DSS.

¶ 9         On 20 February 2019, the Nash County DSS filed a motion to terminate respondent-father's parental rights in Jill. In its termination petition, the Nash County DSS alleged that Jill was an abused and neglected juvenile and that there was a reasonable probability that she would experience abuse and neglect in the future in the event that she was to be returned to respondent-father's care, *see* N.C.G.S. § 7B-1111(a)(1) (2019), and that respondent-father had willfully abandoned Jill, *see* N.C.G.S. § 7B-1111(a)(7) (2019).

¶ 10         On 5 March 2019, Judge Pell C. Cooper entered a permanency planning order that changed the primary permanent plan for Jill to adoption with a secondary plan of reunification. Following a hearing held on 7 March 2019, at which respondent-father was, for the first time, physically present, Judge Anthony W. Brown entered a permanency planning order on 15 April 2019. In his order, Judge Brown found that respondent-father had sent a few e-mails to the maternal aunt, with whom Jill continued to be placed, and that respondent-father was financially able to parent Jill.

In addition, Judge Brown ordered the Nash County DSS to "inform the therapist to contemplate the issue of visitation by [respondent-father] with [Jill]."

¶ 11        As the result of a hearing held on 4 April 2019, Judge Cooper entered a permanency planning order on 15 May 2019 in which he permitted respondent-father to initiate contact with Jill by writing her a letter to be screened by the Nash County DSS and the guardian ad litem before it could be presented to Jill. In addition, Judge Cooper ordered respondent-father to actively participate in all Child and Family Team meetings and to appear at all hearings that were held for the purpose of considering his situation with respect to Jill.

¶ 12        After a hearing held on 13 June 2019 which respondent-father attended telephonically, the trial court entered a permanency planning order on 23 July 2019. In its order, the trial court found that Jill had been receiving therapy from Annie Shaw since March 2018 for the purpose of addressing concerns arising from the sexual abuse that she had experienced at the hands of the mother's husband. However, Ms. Shaw did not believe that it was her role to make a recommendation concerning the issue of whether respondent-father should visit with Jill and stated that she "had never intended to do so." Instead, Ms. Shaw had only intended to assist Jill in preparing for such a visit in the event that one was to occur and declined to express an opinion concerning whether it would be "harmful or helpful" for Jill to visit with respondent-father. The trial court found, on the other hand, that the Nash

County DSS and counsel for the parties had believed that Ms. Shaw would make a recommendation concerning the issue of visitation and had acted in accordance with that belief.

¶ 13    The issues raised by the termination motion came on for hearing before the trial court on 25 June 2019 and 25 July 2019. On 23 September 2019, the trial court entered an order concluding that both grounds for termination alleged in the termination motion existed and that it would be in Jill's best interests for respondent-father's parental rights to be terminated. As a result, the trial court terminated respondent-father's parental rights in Jill. *See* N.C.G.S. § 7B-1110(a) (2019). Respondent-father noted an appeal to this Court from the trial court's termination order.

¶ 14    In seeking relief from the trial court's termination order before this Court, respondent-father argues that the trial court erred by determining that his parental rights in Jill were subject to termination on the basis of neglect, N.C.G.S. § 7B-1111(a)(1), and willful abandonment, N.C.G.S. § 7B-1111(a)(7). According to well-established North Carolina law, trial courts utilize a two-step process in determining whether a parent's parental rights in a child should be terminated that consists of an adjudicatory stage and a dispositional stage. N.C.G.S. §§ 7B-1109, -1110 (2019). At the adjudicatory stage, the petitioner bears the burden of proving by "clear, cogent, and convincing evidence" the existence of one or more of the grounds for termination

delineated in N.C.G.S. § 7B-1111(a). N.C.G.S. § 7B-1109(e)–(f) (2019). This Court reviews a trial court's adjudication decision in order "to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law." *In re Montgomery*, 311 N.C. 101, 111 (1984) (citing *In re Moore*, 306 N.C. 394, 404 (1982)). "If [the trial court] determines that one or more grounds [for termination] listed in section 7B-1111 are present, the court proceeds to the dispositional stage, at which the court must consider whether it is in the best interests of the juvenile to terminate parental rights." *In re D.L.W.*, 368 N.C. 835, 842 (2016) (citing *In re Young*, 346 N.C. 244, 247 (1997); N.C.G.S. § 7B-1110).

¶ 15     In support of its adjudication decision, the trial court found as a fact that:

> 7.     The Court takes judicial notice of the court order in the underlying action adjudicating [Jill] as an abused and neglected juvenile[.]
>
> . . . .
>
> 9.     The relationship between [the parents] was problematic and [the mother] frequently left the home and came to Nash County to be with her family. . . . [The parents] moved to Buncombe County where [Jill] was born. While living in Buncombe County, they each sought and obtained Domestic Violence Protection orders [(DVPO)] on each other.
>
> 10.     After [the mother] left [respondent-father] for the final time in 2010, she returned to live with family in Nash County. [The mother] left with [Jill] and [Steven] remained with [respondent-father]. In Nash County[, the mother] obtained a DVPO against

[respondent-father]. As a part of the DVPO order [respondent-father] was allowed to have supervised visitation at the Nashville Police Department. [Respondent-father] did not attend the DVPO hearing, nor did he ever exercise his visitation with [Jill]. [Respondent-father] has not seen [Jill] since she and her mother left Buncombe County in 2010. Although he believed they were in Nash County, [respondent-father] made no known efforts to find [Jill] or her mother. [The mother] changed her phone number and [respondent-father] stated he had no way to contact her as her family reportedly told him they did not know where [the mother] and [Jill] were located. [The maternal aunt] says she was never contacted by [respondent-father] until he was provided with the email address of [Jill's] placement by the Department in 2018. [Respondent-father] knew where [the mother's] mother resided in Nash County having visited [the mother] there previously. [The mother's] mother and family continue to reside in the same homes they lived in at the time of the visits by [respondent-father].

. . . .

12. In 2017, [respondent-father] was made aware that there was a child protective services investigation in Nash County involving [Jill]. Due to confidentiality he was not given specific details. However, [respondent-father] admits that although knowing what he did know, he still made no effort to contact [the mother's] relatives in Nash County to check on his daughter nor did he inquire about her well-being with the Nash County social worker.

13. Nash County social worker, Roxanne Hill, contacted [respondent-father] by phone on July 14, 2017 informing him of the child protective services investigation involving [Jill]. During that conversation [respondent-father] was unable to

recall when he had last seen [Jill] but [h]e had spoken with her but could not remember when that had transpired. He stated he was focused on [Steven] and had no time for anything else, stating [Steven] is a "hand full". He did not ask about [Jill's] well-being or where she was living, although that information was available to him at the time.

14. At the time of the Nash County investigation with [Jill], [Buncombe DSS] had an open investigation with [respondent-father] concerning [Steven]. . . . [Steven] was adjudicated neglected and dependent in Buncombe County on February 22, 2018 and placed in the custody of Buncombe County.

15. Prior to being removed from his father, [Steven] did not attend school. [Respondent-father] attempted to home school [Steven] but never completed the required documents regarding attendance for [Steven] to receive credit. When [Steven] entered foster care and was enrolled in public schools, he was found to be behind academically. His grades and academic progress improved while he was in foster care.

. . . .

18. [Respondent-father] stated he began attending therapy at Family Preservation a week after [Steven] was removed from his care. Jane Jones, Social Worker with Family Preservation Services worked with [respondent-father] from November 9, 2017 until October 2018 when he was no longer eligible for their services due to a change in their mandate for services. On June 6, 2019, [h]e returned to Family Preservation and continues to be seen. Ms. Jones had no knowledge of the issues regarding his involvement with Buncombe County and did not inquire. She did attend two [CFT]

meetings at Buncombe [DSS] and believes he completed the goals set for him. . . .

. . . .

20.     [Respondent-father] has never been employed for more than a few weeks at a time. He was diagnosed with Crohn's Disease at age 13 and was approved for disability in 2002. [Respondent-father] receives $770.00 monthly in disability of which $50.00 is deducted for child support for [Jill] and $350.00 in Food and Nutrition benefits. [Respondent-father] never voluntarily paid child support and payments did not begin until January 4, 2019 from his social security benefits. He struggles to provide for himself and [Steven] and according to [respondent-father] his sister assists him financially when he needs help. At times, he cannot pay his rent. He does not have a driver's license and he has not had a motor vehicle in over ten years.

21.     [Respondent-father] did not attend any hearings regarding [Jill] until after [DSS] filed the [m]otion to terminate his parental rights on February 20, 2019. He participated by phone for two hearings and only attended five. Two of which were hearings on the [m]otion to terminate his parental rights.

22.     [Respondent-father] attended court hearings regarding [Steven] in Buncombe County but did not initially comply with their case plan. The Court ordered that he submit to a Psychosexual Evaluation which he did not do in a timely manner. The therapist attended a hearing in Buncombe County to request additional information that she did not receive from [respondent-father] so that the evaluation could be completed.

23.     The plan in Buncombe County was completed by [respondent-father] and as his plan in Nash County

was to complete the Buncombe County plan, the Nash County plan was also completed.

23.[4]    There were Domestic Violence orders involving [respondent-father] and his mother . . . in Buncombe County. Due to the volatile relationship and verbal altercations in the presence of [Steven,] [respondent-father's] mother was not to be present in the home[.] In October of 2018, [respondent-father] was hospitalized and had surgery. Upon his discharge from the hospital, [his mother] moved into [his] home to care for him in violation of the Buncombe [DSS] plan. . . .

24.      [Respondent-father] states he had no one else who could or would assist him and his condition was such that he was unable to care for himself. He states he has no friends or any support system that could have helped him during his recovery.

25.      [Respondent-father] was contacted by Foster Care Supervisor, Stephanie Grischow on a regular basis to keep him informed about [Jill]. Ms. Grischow initiated the contacts between [respondent-father] and herself. She often left messages for him to return her call. It would require multiple messages from Ms. Grischow before her calls would be returned. [Respondent-father] missed three consecutive meetings. Ms. Grischow contacted him encouraging him to attend and participate in the meetings. He participated in some Child and Family Team Meetings by phone.

26.      On July 26, 2018 [respondent-father] was provided the email address of [the maternal aunt] so that he could contact her and inquire about [Jill] and her wellbeing. Again on August 27, 2018 and September 18, 2018 he was given the email address because he

---

[4] The trial court's order had two findings of fact numbered 23.

said he had lost the address. The first email to [the maternal aunt] was sent September 18, 2018. There was a total of twelve emails in fourteen months: November 9, 2018, December 19, 2018, December 27, 2018, February 22, 2019, February 26, 2019, March 3, 2019, March 21, 2019, April 20, 2019, May 7, 2019, and May 22, 2019. [The maternal aunt] responded to all the emails received. [Respondent-father] at times sent pictures of clothing to [the maternal aunt] asking for [Jill's] size and whether [Jill] would like them. He never sent anything. He has not sent her cards or gifts for her birthdays or holidays since she moved to Nash County in 2010. [The mother] denies blocking [respondent-father] from Facebook.

27. . . . . [Respondent-father] made no effort to locate his daughter or inquire of her maternal family about her well-being or whereabouts since [respondent-mother] and [Jill] left his home in 2010. By his own statements, [respondent-father] did not make efforts as he had his hands full with [Steven]. He was provided [the maternal aunt's] e-mail address and did not even utilize the email to contact [the maternal aunt] for two months after having the address as he lost it twice. And even then, [respondent-father] only sent twelve emails in over a year's time. [Jill] was 9 years old, before [respondent-father's] paternity was established and it was only done . . . at the request and effort of [Nash DSS]. [Respondent-father] stated he was not a legal expert and did not know how to go about establishing he was her father. Yet paternity of [Steven] was established by Buncombe County over six months prior to the testing for [Jill] and he did not inquire about testing for [Jill] even after becoming aware of the process. . . .

. . . .

30.     [Jill] is in therapy to address the trauma of her sexual abuse. Due to scheduling conflicts with the previous therapist, Annie Shaw, and travel issues, it was in [Jill's] best interest to change therapist[s].

31.     While under Ms. Shaw's care, [respondent-father] was allowed to write [Jill] a letter. The letter was reviewed by [Nash DSS]. Ms. Shaw read the letter to [Jill] in a therapy session. Ms. Shaw assisted [Jill] in processing her feelings after hearing the letter. Previously, [Jill] had expressed interest in the possibility of seeing her father and asking him why he had not been in her life for seven years. After hearing the letter, she no longer wanted to see him stating the letter made her feel "icky" and that it made her think of the "other one", referring to [her stepfather]. [Respondent-father] has written a second letter which has been given to [Jill's] current therapist, but [Jill] has not yet seen the letter.

32.     All parties thought [Ms.] Shaw would be providing a recommendation to the Court regarding visitation by [respondent-father]. When Ms. Shaw testified in court on June 13, 2019, she stated "it was not, nor was it ever her role to make a recommendation regarding the father's visitation[.]" Ms. Shaw only intended to prepare [Jill] for a visit if it were to be ordered by the Court.

33.     [Respondent-father] through his inaction for most of [Jill's] life prior to and including the six months immediately preceding the filing of the Motion to terminate parental rights, has displayed a willful neglect and refusal to perform the natural and legal obligations of parental care and support. He has withheld his presence, his love, his care. Further, he has failed to afford himself of the opportunities to display filial affection in such a manner that demonstrates he has relinquished all parental

claims. Therefore, he has neglected and abandoned [Jill].

34. In light of [respondent-father's] nearly complete absence from [Jill's] life prior to the filing of the Motion to terminate parental rights, it is probable that neglect would continue if she were returned to his care.

35. [Respondent-father] had the ability to achieve contact with [Jill] irrespective of his financial and social resources.

¶ 16 As an initial matter, respondent-father challenges the sufficiency of the evidentiary support for several of the trial court's findings of fact. First, respondent-father contends that the portions of Finding of Fact No. 10 stating that the mother had left him "for the final time in 2010" and that he had not exercised the right to participate in supervised visitation with Jill as permitted by the Nash County DVPO order lack sufficient record support. A careful review of the record persuades us respondent-father's contention has merit given that nothing in the record provides support for the specific factual statements that respondent-father has contested. As a result, we will disregard the relevant portions of Finding of Fact No. 10 and those portions of Finding of Fact Nos. 26 and 27 that state that the mother left respondent-father in 2010, rather than 2011, in determining the extent to which the trial court's findings of fact provide sufficient support for its determination that respondent-father's parental rights in Jill were subject to termination on the basis of neglect and

willful abandonment. *See In re N.G.*, 374 N.C. 891, 901 (2020) (disregarding findings of fact that were not supported by sufficient record evidence).

¶ 17 Secondly, respondent-father challenges the sufficiency of the evidentiary support for those portions of Finding of Fact Nos. 10 and 27 that state that he made no known efforts to locate the mother or Jill or to inquire of members of the mother's family concerning Jill's location or well-being since the mother left Buncombe County with Jill. At the termination hearing, respondent-father testified that he had contacted the mother's family following her departure from Buncombe County with Jill and had been told that they did not know where the mother was and that respondent-mother had changed her phone number and blocked his ability to send Facebook messages to her. Although the trial court was not required to deem respondent-father's testimony to be credible, *see In re D.L.W.*, 368 N.C. 835, 843 (2016), it appears that the trial court predicated the challenged portions of its findings of fact upon testimony presented by the maternal aunt at the dispositional phase of the proceeding to the effect that respondent-father had not made any contact with the mother's family until he had been provided with her e-mail address by the Nash County DSS in 2018. In the event that the trial court relied upon this dispositional evidence as support for its adjudicatory finding that respondent-father had not made any efforts to locate the mother or Jill since their departure from Buncombe County, we agree with longstanding Court of Appeals precedent that it was error to do so. *See*

*In re Mashburn,* 162 N.C. App. 386, 396 (2004) (noting that a trial court should not consider testimony received at the dispositional phase of a termination proceeding in making adjudicatory findings of fact). As a result, we hold that the relevant portions of Finding of Fact Nos. 10 and 27 should not be considered in evaluating the validity of respondent-father's challenges to the trial court's adjudicatory decisions.

¶ 18          Similarly, respondent-father contends that the portion of Finding of Fact No. 15 stating that Steven had been "behind academically" at the time that he entered foster care and enrolled in public school was not supported by the record evidence. However, a 12 June 2018 dispositional order entered in the Buncombe County proceeding regarding Steven that was admitted into evidence at the termination hearing reflects that, while Steven had been "doing well integrating into the 4th grade," he was "on a first grade level in math" and had "advanced approximately two years in his math skills since being placed in his foster home five months ago." As a result, we hold that the challenged portion of Finding of Fact No. 15 has sufficient evidentiary support.

¶ 19          Moreover, respondent-father argues that the portion of Finding of Fact No. 18 indicating that "Ms. Jones[, a social worker with Family Preservation Services,] had no knowledge of the issues regarding his involvement with Buncombe County and did not inquire[ ]" into that subject mischaracterizes her testimony and contradicts the remainder of that finding, which states that Ms. Jones had attended two Child Family

Team meetings at Buncombe DSS and "believes he completed the goals set for him." A careful review of the record satisfies us that Finding of Fact No. 18 does contain the internal inconsistency described in respondent-father's brief and conflicts with Ms. Jones' testimony at the termination hearing, which reflects an adequate understanding of the nature and extent of respondent-father's involvement with the Buncombe County DSS. More specifically, Ms. Jones' testimony reflects that she was familiar with the goals set out in respondent-father's Buncombe County case plan and indicates that respondent-father had addressed domestic violence and substance abuse issues in the course of complying with the relevant plan requirements. For that reason, we will disregard the trial court's statement in Finding of Fact No. 18 that Ms. Jones lacked knowledge of the issues that were addressed during respondent-father's period of involvement with the Buncombe County DSS in determining the validity of the trial court's adjudicatory decision. *See In re N.G.*, 374 N.C. at 901.

¶ 20 Respondent-father also challenges the portion of Finding of Fact No. 21 which provides that he "did not attend any hearings regarding [Jill] until after the Nash County [DSS] filed the [m]otion to terminate his parental rights on February 20, 2019[ ]" as not supported by the evidence. A careful review of the record clearly indicates respondent-father participated in the hearing concerning the underlying juvenile petition that was on held on 7 June 2018 by telephone. As a result, we will

disregard the challenged portion of Finding of Fact No. 21 in evaluating the correctness of the trial court's adjudicatory determinations. *See id.*

¶ 21 Next, respondent-father contends the trial court's statement in Finding of Fact No. 22 that he "did not initially comply" with his Buncombe County case plan conflicts with the record evidence. As the initial dispositional order entered in the Buncombe County proceeding on 12 June 2018 reflects, respondent-father was ordered to submit to random drug screens, participate in a psychosexual evaluation, and complete a parenting class in order to be reunited with Steven. However, the trial court determined in Finding of Fact No. 22, which has not been challenged as lacking in sufficient record support, that respondent-father did not complete the required psychosexual evaluation in a timely manner. *In re Z.L.W.*, 372 N.C. 432, 437 (2019) (stating that unchallenged findings are deemed to have sufficient record support and are binding for purposes of appellate review). In addition, while respondent-father testified at the termination hearing that he began participating in his psychosexual evaluation as soon as he was ordered to do so, the therapist who conducted the evaluation had expressed concern about the extent to which respondent-father was "being forthright with regard to her evaluation," a development that resulted in the holding of additional hearings "to decide how best to handle" the situation and a request on the part of the therapist to be allowed to review additional records. As a result, we hold that the trial court was entitled to infer from this evidence that

respondent-father had initially failed to comply with his Buncombe County case plan. *See In re D.L.W.*, 368 N.C. at 843 (stating that the trial judge has the responsibility for considering the evidence, evaluating the credibility of the witnesses, and making any reasonable inferences that can be drawn from the record evidence).

¶ 22        In addition, respondent-father argues that the trial court erred by stating in Finding of Fact No. 24 that he "ha[d] no friends or any support system that could have helped him during his recovery" from surgery. According to respondent-father, his original plan following his discharge from the hospital in 2018 was to go to Virginia and stay with his sister. In support of this assertion, respondent-father relies upon testimony that his sister provided at the dispositional phase of the proceeding; however, as we have previously stated, such testimony is insufficient to support an adjudicatory finding. *See In re Mashburn,* 162 N.C. App. 396. On the other hand, respondent-father testified at the adjudicatory hearing that he had allowed his mother to enter his home following the surgical procedure that was performed upon him because "I didn't know anybody else that would look after me and help me with my recovery[.]" In light of this testimony, we hold that the record contains sufficient evidentiary support for the trial court's finding that respondent-father had stated he had no one else other than his mother to assist him during his convalescence following surgery.

¶ 23          In his penultimate challenge to the trial court's findings of fact, respondent-father argues that the portion of Finding of Fact No. 25 stating that he had "missed three consecutive [Child Family Team] meetings" lacked sufficient evidentiary support. As the record reflects, a foster care supervisor employed by the Nash County DSS testified that respondent-father had participated by telephone in two of the four Child Family Team meetings held in connection with the underlying juvenile proceeding by phone. More specifically, the foster care supervisor testified that respondent-father had participated in a Child Family Team meeting by phone on 26 July 2018, was absent from a Child Family Team meeting that was held on 23 October 2018, participated in a Child Family Team meeting by phone on 24 January 2019, and was absent from a Child Family Team meeting that was held on 23 April 2019. As a result, given that the record provides no support for the trial court's finding that respondent-father had missed three consecutive Child Family Team meetings, we will disregard this portion of Finding of Fact No. 25 in determining whether the trial court properly determined that respondent-father's parental rights in Jill were subject to termination on the basis of neglect and willful abandonment. *In re N.G.*, 374 N.C. at 901.

¶ 24          Finally, respondent-father contends that Finding of Fact Nos. 33 through 38 constitute "ultimate facts bordering on conclusions of law." Although the trial court labeled the relevant portions of its termination order as findings of fact rather than

conclusions of law, its determinations that respondent-father had "displayed a willful neglect," "relinquished all parental claims," "neglected and abandoned [Jill]," and "neglect would [probably] continue if [Jill] were returned to [respondent-father's] care" involve the application of legal principles to the facts rather than factual findings. Given that "findings of fact which are essentially conclusions of law will be treated as such on appeal," *State v. Sparks*, 362 N.C. 181, 185 (2008) (cleaned up), we will treat the challenged portions of Finding of Fact Nos. 33 through 38 in that manner in evaluating the validity of respondent-father's remaining challenges to the trial court's adjudicatory decision.

¶ 25        In challenging the trial court's determination that grounds for terminating his parental rights in Jill existed, respondent-father begins by arguing that the trial court's findings of fact did not support its conclusion that his parental rights in Jill were subject to termination on the grounds of willful abandonment. The termination of a parent's parental rights in a child on the basis of abandonment pursuant to N.C.G.S. § 7B-1111(a)(7) requires proof that "[t]he parent has willfully abandoned the juvenile for at least six consecutive months immediately preceding the filing of the petition[.]" N.C.G.S. § 7B-1111(a)(7) (2019). "Abandonment implies conduct on the part of the parent which manifests a willful determination to forego all parental duties and relinquish all parental claims to the child." *In re Young*, 346 N.C. 244, 251 (1997) (quoting *In re Adoption of Searle*, 82 N.C. App. 273, 275 (1986)); *see also*

*Pratt v. Bishop*, 257 N.C. 486, 502 (1962) (stating that "[a]bandonment requires a willful intent to escape parental responsibility and conduct in effectuation of such intent"). In light of that fact, this Court has stated that, "if a parent withholds his presence, his love, his care, the opportunity to display filial affection, and willfully neglects to lend support and maintenance, such parent relinquishes all parental claims and abandons the child." *Pratt*, 257 N.C. at 501. "Although the trial court may consider a parent's conduct outside the six-month window in evaluating a parent's credibility and intentions, the 'determinative' period for adjudicating willful abandonment is the six consecutive months preceding the filing of the petition." *In re N.D.A.*, 373 N.C. 71, 77 (2019) (quoting *In re D.E.M.*, 257 N.C. App. 618, 619 (2018)).

In view of the fact that the motion to terminate respondent-father's parental rights in Jill was filed on 20 February 2019, the determinative six-month period ran from 20 August 2018 through 20 February 2019. In arguing that the trial court erred by determining that his parental rights in Jill were subject to termination on the basis of willful abandonment, respondent-father notes that he was precluded from having any contact with Jill during the relevant period of time, that he fully complied with the case plan that was established in Buncombe County and adopted in Nash County, and that he never demonstrated that he willfully intended to forego all of his parental duties or to relinquish his parental claims to Jill.

¶ 27 The trial court's unchallenged findings of fact indicate that respondent-father made child support payments during the relevant six-month period beginning on 4 January 2019. In addition, the trial court found that respondent-father sent e-mails to the maternal aunt with whom Jill had been placed for the purpose of inquiring about Jill's well-being on 18 September 2018, 9 November 2018, 19 December 2018, and 27 December 2018. Finally, the trial court found that respondent-father had attended a Child Family Team meeting and completed the requirements of his case plan during the relevant six-month period. As a result, rather than reflecting a willful withholding of his parental love and affection from Jill, the trial court's findings establish that respondent-father took a number of affirmative actions, including sending e-mails to the maternal aunt, attending a Child Family Team meeting, and satisfying the requirements of his case plan during the relevant six-month period in an attempt to show his love, concern, and affection for Jill.

¶ 28 Admittedly, respondent-father did not visit with Jill at any time during the relevant six-month period. However, the order adjudicating Jill to be an abused and neglected juvenile entered by Judge Boyette precluded visitation between respondent-father and Jill until the occurrence of such visits was recommended by Ms. Shaw. Subsequently, unchallenged testimony from a foster care supervisor employed by the Nash County DSS indicates that respondent-father wished to be allowed to visit with Jill and contacted Ms. Shaw for that purpose on at least two

occasions. Although the trial court's unchallenged findings of fact indicate that all parties believed that Ms. Shaw would make a recommendation regarding the extent to which visitation between respondent-father and Jill would be appropriate, Ms. Shaw testified on 13 June 2019 that "it was not, nor was it ever her role to make a recommendation regarding the father's visitation" and that she never intended to do anything other than prepare Jill for a visit with respondent-father in the event that such visits were allowed to take place. Since all of the parties, including respondent-father, were expecting a recommendation from Ms. Shaw concerning the extent, if any, to which respondent-father should be permitted to visit with Jill before such visits would be allowed, his failure to have personal contact with Jill during the relevant six-month period was neither voluntary nor attributable to any failure on his part to seek to visit with Jill. As a result, the trial court erred to the extent that it determined that respondent-father's parental rights in Jill were subject to termination on the basis of willful abandonment pursuant to N.C.G.S. § 7B-1111(a)(7) due to the absence of visits between respondent-father and Jill. *Cf. In re T.C.B.*, 166 N.C. App. 482, 486–87 (2004) (holding that the trial court's conclusion that the parent's parental rights were subject to termination on the basis of abandonment was not supported by the trial court's visitation-related findings given the fact that the respondent's attorney had instructed him to avoid contact with the child and the fact

that a subsequent protection plan prohibited visitation between the respondent and the child).

¶ 29        Although respondent-father could, of course, have done more than he did in order to exhibit his concern for Jill, the steps that he did take as reflected in the trial court's findings of fact suffice to preclude a finding that his parental rights were subject to termination on the basis of willful abandonment. Simply put, the trial court's findings of fact do not "support a conclusion that respondent-father completely withheld his love, affection, and parental concern for the" child, thereby "rendering his parental rights in [the child]" subject to termination" for abandonment. *In re A.G.D.*, 374 N.C. 317, 325 (2020). As a result, we hold that the trial court's determination that respondent-father's parental rights in Jill were subject to termination on the basis of abandonment must be reversed.

¶ 30        Finally, respondent-father argues that the trial court erred by concluding that his parental rights in Jill were subject to termination based upon neglect. A trial court may terminate a parent's parental rights in the event that the parent has neglected the juvenile. N.C.G.S. § 7B-1111(a)(1) (2019). A "neglected juvenile" is defined as "[a]ny juvenile . . . whose parent, guardian, custodian, or caretaker does not provide proper care, supervision, or discipline; or who has been abandoned; . . . or who lives in an environment injurious to the juvenile's welfare[.]" N.C.G.S. § 7B-101(15) (2019). "In deciding whether a child is neglected for purposes of terminating

parental rights, the dispositive question is the fitness of the parent to care for the child 'at the time of the termination proceeding.' " *In re N.D.A.*, 373 N.C. at 80.

> When it cannot be shown that the parent is neglecting his or her child at the time of the termination hearing because "the child has been separated from the parent for a long period of time, there must be a showing of past neglect and a likelihood of future neglect by the parent."

*In re Z.A.M.*, 374 N.C. 88, 95 (2020) (quoting *In re D.L.W.*, 368 N.C. at 843 (2016))[5];

*see also In re N.D.A.*, 373 N.C. at 80.

As an initial matter, we note that this Court has held that

> [a] trial court is entitled to terminate a parent's parental rights in a child for neglect based upon abandonment pursuant to N.C.G.S. § 7B-1111(a)(1) in the event that the trial court finds that the parent's conduct demonstrates a "wil[l]ful neglect and refusal to perform the natural and legal obligations of parental care and support."

*In re N.D.A.*, 373 N.C. at 81 (quoting *Pratt*, 257 N.C. at 501). In order to conclude that "neglect by abandonment" is present, the trial court's findings must reflect "that the parent has engaged in conduct 'which manifests a willful determination to forego all parental duties and relinquish all parental claims to the child' as of the time of

---

[5] As this Court noted in *In re R.L.D.*, 375 N.C. 838, 841 n.3 (2020), "a showing of past neglect is [not] necessary in order to terminate parental right [on the basis of neglect] in every case." On the contrary, we pointed out in that decision that N.C.G.S. § 7B-101(15) "does not require a showing of past neglect if the petitioner can show current neglect." *Id.* However, given that the record before the Court in this case does contain a finding of past neglect, the analysis set out in the text is appropriate for use in evaluating the validity of respondent-father's challenge to the trial court's determination that his parental rights in Jill were subject to termination on the basis of neglect.

the termination hearing," *id.* at 81, with the trial court being required to consider the parent's conduct over an extended period of time continuing up to and including the time at which the termination hearing is being held. *Id.* at 81–82.

¶ 32    The trial court appears to have incorporated a "neglect by abandonment" theory in Finding of Fact No. 33, which states that respondent-father had, for "most of [Jill's] life prior to and including the six months immediately preceding the filing of the [m]otion to terminate parental rights," "displayed a willful neglect and refusal to perform the natural and legal obligations of parental care and support" by "with[o]ld[ing] his presence, his love, [and] his care" and by "fail[ing] to afford himself of the opportunities to display filial affection" so as to neglect Jill. However, the trial court's findings of fact reflect that respondent-father began paying child support on 4 January 2019, that he attended some of the hearings that were held in the underlying juvenile proceeding, that he satisfied the requirements set out in the case plan that was adopted by the Buncombe County DSS and the Nash County DSS, that he participated in some Child Family Team meetings, that he sent twelve e-mails to the maternal aunt with whom Jill was residing for the purpose of keeping informed about Jill's situation, and that he wrote two letters to Jill. Although respondent-father did not ever visit with Jill, his failure to do so cannot be directly attributed to any failure on his part to seek the right to participate in such visits for the reasons set out in greater detail earlier in this opinion. As a result, given that the trial court's findings

of fact fail to establish that respondent-father "manifest[ed] a willful determination to forego all parental duties" with respect to Jill, *In re N.D.A.*, 373 N.C. at 81, and, in fact, supported the opposite conclusion, the trial court erred to the extent that it determined that respondent-father's parental rights in Jill were subject to termination on the basis of a "neglect by abandonment" theory.

¶ 33      A determination that respondent-father did not neglect Jill on the basis of abandonment does not, however, end our inquiry concerning the viability of the trial court's conclusion that respondent-father's parental rights in Jill were subject to termination on the basis of neglect. Instead, we note that the trial court also appears to have found the existence of the neglect ground for termination on the basis of a prior finding of neglect and the likelihood of future neglect as well given its decision to "take[ ] judicial notice of the court order in the underlying action adjudicating the child as an abused and neglected juvenile" and given its finding that, "[i]n light of [respondent-father's] nearly complete absence from [Jill's] life prior to the filing of the [m]otion to terminate parental rights, it is probable that neglect would continue if she were returned to his care." As a result, we must evaluate the extent, if any, to which the trial court's findings of fact support its determination that respondent-father's parental rights in Jill were subject to termination on the basis of the "prior neglect and likelihood of a repetition of neglect."

¶ 34          As we have already noted, in the event that there has been a previous finding of neglect and the juvenile has not resided in the parental residence for an extended period of time, the principal issue that the trial court is required to consider in determining whether the parent's parental rights in the child are subject to termination on the grounds of neglect is the likelihood that the juvenile would experience a repetition of the neglect to which he or she had previously been subjected in the event that he or she was returned to the parent's care based upon an analysis of the record evidence concerning the situation leading up to and existing at the time of the termination hearing. *In re N.D.A.,* 370 N.C. at 80. Although the trial court appears to have attempted to utilize this analytical rubric in the termination order, its finding that a repetition of neglect was likely in the event that Jill was returned to respondent-father's care rests solely upon respondent-father's "nearly complete absence from [Jill's] life prior to the filing of the [m]otion to terminate parental rights." In view of the fact that the trial court clearly failed to consider any of the evidence concerning events that had occurred prior to the filing of the termination motion other than respondent-father's lengthy absence from Jill's life or any of the evidence concerning events that occurred subsequent to the filing of the termination motion in determining the likelihood that the neglect to which Jill had been subjected would be repeated in the event that she was placed in respondent-father's care, the trial court's findings of fact do not suffice to support a determination that respondent-

father's parental rights in Jill were subject to termination on the basis of "prior neglect and likelihood of a repetition of neglect" theory.

¶ 35          On the other hand, however, the record contains evidence from which a proper repetition of neglect finding could be made in the event that the trial court deemed that evidence to be credible. Among other things, the trial court's other findings of fact reflect that respondent-father "made no effort to locate his daughter or inquire of her maternal family about her well-being" for a substantial period of time after the mother and Jill left Buncombe County, that respondent-father failed to make any effort to locate Jill because "he had his hands full with Steven, that Steven had been adjudicated to be a neglected and dependent juvenile in Buncombe County based upon events that occurred while he was in respondent-father's custody, that respondent-father had failed to complete the psychosexual evaluation that he was ordered to receive in Buncombe County in a timely manner, that respondent-father did not initially comply with his Buncombe County case plan, that respondent-father made no attempt to establish his paternity of Jill until the Nash County DSS arranged for the performance of the necessary test, that it was difficult for employees of the Nash County DSS to reach respondent-father, and that respondent-father was slow in making contact with the maternal aunt after being provided with her e-mail address. In addition, the record contains evidence that, while not fully reflected in the trial court's findings of fact, tends to show that respondent-father exhibited

boundary-related limitations in attempting to care for Steven and that Steven exposed himself to Jill during a sibling visit  Thus, since we believe that the record contains evidence from which the trial court could, if it elected to do so, find that a repetition of neglect would be probable in the event that Jill was returned to respondent-father's care, we conclude that the portion of the trial court's order determining that respondent-father's parental rights in Jill were subject to termination on the basis of neglect lack sufficient support in the trial court's findings of fact; that the relevant portion of the trial court's order should be vacated; and that this case should be remanded to the District Court, Nash County, for the entry of a new order concerning the extent, if any, to which respondent-father's parental rights in Jill are subject to termination on the basis of neglect and, if so, whether it would be in Jill's best interests for respondent-father's parental rights to be terminated.[6]

Thus, for the reasons set forth above, we conclude that the trial court's determination that respondent-father's parental rights in Jill were subject to termination on the basis of abandonment and neglect by abandonment lacked sufficient support in the trial court's findings of fact and that the trial court's determination that respondent-father's parental rights in Jill were subject to

---

[6] In view of our determination that the trial court's findings fail to support its conclusion that respondent-father's parental rights in Jill were subject to termination on the basis of any of the grounds for termination set forth in N.C.G.S. § 7B-1111(a), we need not address respondent-father's challenge to the trial court's determination that the termination of his parental rights would be in Jill's best interests.

termination on the basis of prior neglect and the likelihood of a repetition of neglect rested upon a misapplication of the applicable law. As a result, the trial court's termination order is reversed, in part, and vacated, in part, and this case is remanded to the District Court, Nash County, for further proceedings not inconsistent with this opinion, including the entry of a new termination order containing proper findings of fact and conclusions of law concerning the extent to which respondent-father's parental rights in Jill were subject to termination on the basis of prior neglect coupled with the likelihood of a repetition of neglect and whether the termination of respondent-father's parental rights would be in Jill's best interests.

REVERSED, IN PART; VACATED AND REMANDED, IN PART.